IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

UNITED STATES OF AMERICA,     :

         Plaintiff,               Case No. 3:13-cr-51(1)

     v.             :

KENNETH WYNN,               JUDGE WALTER H. RICE

         Defendant.     :

---

DECISION AND ENTRY SUSTAINING DEFENDANT KENNETH WYNN'S
MOTION TO SUPPRESS EVIDENCE (DOC. #35)

---

Defendant Kenneth Wynn ("Wynn" or "Defendant Wynn") has been charged with possession with intent to distribute heroin under 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 841(b)(1)(C); possession of a firearm under 18 U.S.C. § 922(g)(1); possession of ammunition under 18 U.S.C. § 922(g)(1); and aiding and abetting his co-defendant, Christopher Palmer ("Palmer" or "Defendant Palmer"), in corruptly attempting to alter, destroy, mutilate and conceal a mixture or substance containing heroin with intent to impair its integrity and availability for use in an official proceeding under 18 U.S.C. § 1512(c) and 18 U.S.C. § 2. Pending before the Court is Defendant Wynn's Motion to Suppress Evidence (Doc. #35), in which Wynn seeks an order suppressing any evidence that the Government may introduce against him recovered from a March 7, 2013, search of his apartment.

The Court held an oral and evidentiary hearing on August 7, 2013. Doc. #39.

Post-hearing briefs were filed by the Government (Doc. #43) on October 4, 2013,

and by Defendant Wynn (Doc. #46) on October 19, 2013. The Government filed a

Reply to Defendant's Memorandum on October 18, 2013 (Doc. #45), and

Defendant filed a Reply Memorandum on October 19, 2013 (Doc. #46). The

Court's subject matter jurisdiction arises under 18 U.S.C. § 3231.

For the reasons set forth below, the Court SUSTAINS the Defendant's

Motion to Suppress Evidence (Doc. #35).

## I.   **FINDINGS OF FACT**[1]

On March 7, 2013, a number of law enforcement officers from the City of

Dayton Police Department, the Montgomery County Sheriff's Office, and the

Federal Bureau of Investigation ("FBI") were patrolling an area near the Cornell

Woods apartments on Cornell Drive in Dayton, Ohio. Doc. #41 at 6-7, 9. The

officers were involved in an operation of the Safe Streets Task Force, a task force

created by the FBI to combat drug trafficking and other criminal enterprises. *Id.* at

6. Special Agent Timothy Ferguson of the FBI and Task Force Officer Detective

Rick Bergman of the Montgomery County Sheriff's Office shared a vehicle at the

beginning of that morning's events. *Id.* at 7. After receiving a tip that someone

---

[1] The Court's Findings of Fact are based on the testimony given and exhibits introduced at the oral and evidentiary hearing held on August 7, 2013. Special Agent Ferguson testified as the Government's sole witness. Defendant Wynn's sole witness was Darrionne Norvell.

was selling heroin out of a blue Chevrolet Impala with tinted windows, the officers set up surveillance near the Cornell Woods apartment complex. *Id.* The apartment complex is known to be a "very high drug trafficking area," is only 25% occupied, and has only one way in and out of its parking area. *Id.* at 8, 12.

During the surveillance, Special Agent Ferguson and Detective Bergman saw a blue Impala with tinted windows pull into the Cornell Woods apartment complex. *Id.* at 7. Special Agent Ferguson testified that he observed the vehicle's occupants through the Impala's windshield, which was not tinted, and that the tint of the windows was not dark enough to obscure its occupants. *Id.* at 41. When he first observed the vehicle, he saw a male passenger wearing a "distinctive" lime green hat, who was later identified as Defendant Palmer. *Id.* at 8. The driver was a female, later identified as Joi Wright. *Id.* at 42. Both Special Agent Ferguson and Detective Bergman observed that Palmer was "kneeling down and he was doing something in his lap which I believed to be consistent with individuals who are what we call capping up, if you will. In other words, taking the amounts of heroin and putting them into gel capsules." *Id.* at 43, 45. The agent admitted that he only had "a quick glimpse" and that he "thought that [capping up] could possibly be what he was doing," based on the informant's tip and the matching vehicle description. *Id.* at 44. The vehicles passed each other at a "pretty slow" rate, 20-25 miles per hour, and the officers were able to see over the dashboard of the Impala from where they sat in their Chevy Silverado pickup truck. *Id.* at 44-45.

Shortly after the Impala pulled into the Cornell Woods apartment complex, the officers followed it to the back of the complex. *Id.* at 8. However, the Impala had already been parked and was empty by the time they approached it. *Id*. The officers observed another vehicle parked in the back of the apartment complex, a maroon Toyota Camry with rental car license plates. *Id.* The officers then left to prepare for a traffic stop of the Impala when it left the complex. *Id.*

When the Impala emerged, the man with the lime green hat, previously the passenger, was then seen driving the vehicle, which was followed by the maroon Toyota. *Id.* at 9. The planned traffic stop was unsuccessful. *Id.* The Impala pulled out at a high rate of speed, struck one of the police cruisers positioned at the exit of the apartment complex, and proceeded westbound on Cornell Dr. *Id.* The maroon Toyota went in the opposite direction on that thoroughfare. *Id.* A police cruiser began to pursue the Impala, followed by Special Agent Ferguson and Detective Bergman, while another cruiser followed the eastbound Toyota. *Id.* at 9-11. After the Impala turned northbound onto Gettysburg Ave., the lead cruiser in pursuit clocked it attaining speeds up to 86 miles per hour before it successfully evaded the pursuing officers. *Id.* at 10, 15.

After putting out a radio dispatch describing the pursuit of the Impala, Special Agent Ferguson was informed that the vehicle had been located by another officer, who reported it parked at the Meadows of Catalpa apartment complex.[2]

---

[2] The Meadows of Catalpa apartment complex is approximately four miles away from the Cornell Dr. apartment complex. The Court "may, of course, take judicial

4

*Id.* at 16. Special Agent Ferguson and the other officers proceeded to the Meadows of Catalpa complex in order to arrest the driver of the Impala "for felonious assault on a police officer." *Id.* at 17. Only ten minutes elapsed between the time the Impala was lost on Gettysburg Ave. and the officers' arrival at the Meadows of Catalpa complex. *Id.* at 18.

When the officers arrived, they parked to the west of the complex and then went to the back of it, where they saw the driver of the Impala standing on the third floor balcony of one of the apartment buildings. *Id.* He was wearing the lime green hat. *Id.* at 19. Detective Tim Braun, who was standing under the balcony, heard the man in the lime green hat state, either to someone on the phone or to someone inside the apartment, that "he had just run from the police." *Id.* at 20.

Special Agent Ferguson testified that he was able to "match up" the balcony where the man was standing with Apartment E of the building, after which he and other officers began to approach the apartment door. *Id.* at 21. There were no security doors on the front of the building that impeded the officers' initial access to the building. *Id.* As the officers approached the door to Apartment E, they observed a man, later identified as Dustin Brooks, coming out of the apartment door. *Id.* at 22. Mr. Brooks was not the man in the lime green hat observed on the balcony. *Id.* When asked what apartment he came out of, Mr. Brooks replied

---

notice of geography." *Boyce Motor Lines v. United States*, 342 U.S. 337, 344 (1952); *see also Northwest Airlines, Inc. v. Cnty. of Kent, Mich.*, 955 F.2d 1054, 1060 (6th Cir. 1992) (recognizing that a district court took judicial notice of the geographical distance between places).

that it was Apartment E. *Id.* He was also asked who else was in the apartment, and he replied that two females were inside. *Id.*

The officers then approached the apartment door, knocked, identified themselves as police officers, and asked that the occupants open the door. *Id.* at 23. Ten or fifteen seconds elapsed before a female, later identified as Darrionne Norvell, complied. *Id.* at 24. Special Agent Ferguson believed that the delay was "excessive," based on the small size of the apartment (a one bedroom) and the fact that "at least two or three other individuals" were inside the apartment. *Id.* From outside the apartment, once the door was opened, Special Agent Ferguson saw the man in the lime green hat on a couch (Defendant Palmer) behind Ms. Norvell, as well as another female sitting on another couch. *Id.*

Ms. Norvell was then "pulled" outside and handcuffed, as was the other female inside the apartment. *Id.* at 25-26. The man in the lime green hat, Defendant Palmer, was also ordered out of the apartment in order to arrest him for felonious assault on a police officer. *Id.* According to Special Agent Ferguson, he then asked Ms. Norvell if anyone else was inside the apartment, and she stated that there was not. *Id.* at 26. The agent testified that he "continued to call into the apartment, identified myself as FBI, [and] asked anyone that was in the apartment to come to the door." *Id.* at 27. In spite of Ms. Norvell's assertion, after a short period of time, Special Agent Ferguson saw a pair of hands appear around a corner. *Id*. The hands belonged to Defendant Wynn. *Id.* Special Agent

6

Ferguson then pulled Wynn out into the hallway outside the apartment and handcuffed him.[3] *Id.*

After Special Agent Ferguson handcuffed Defendant Wynn in the hallway, he decided to perform a "safety sweep" of the premises. *Id.* Special Agent Ferguson testified that while in the hallway outside the apartment, he observed no activity that posed a danger to the officers, nor was any reported to him. *Id.* at 65-66. The officers "went into the [apartment] and cleared it room by room[,] just doing a quick check around just to make sure that there were no other bodies that were inside the residence." *Id.* at 28. The officers did not open drawers or cabinets while performing the sweep because they "didn't have a search warrant. The purpose was to merely determine whether there were any other individuals inside the residence. That was it." *Id.*

While conducting the sweep, the officers observed a variety of contraband in plain view. A cup in the kitchen contained a number of empty gel caps, which Special Agent Ferguson testified were of the type used for packaging heroin. *Id.* at 29-35. A baggy of suspected heroin lay on top of a bedroom dresser, and a baggy of suspected marijuana lay in the bathroom sink. *Id.* Firearms were also in plain view. A box for a Glock handgun lay on the bedroom floor next to the nightstand, and an "AR-style" assault rifle was in the back of the open bedroom closet,

---

[3] Special Agent Ferguson actually stated that he "pulled Mr. Wynn out of the apartment complex and handcuffed him," but he could only have meant that he pulled Wynn out of the apartment. Doc. #41 at 27. The evidence indicates that apartment was located on the third floor and that Special Agent Ferguson and the others were in the hallway at this time.

propped against the wall with its barrel pointing towards the ceiling. *Id.*; *see also* Gov. Exs. 5, 5A, 6, 6B, 6D & 6F.

After conducting the sweep, a search warrant for the apartment was issued by Judge Cynthia Heck of the Vandalia Municipal Court, supported by Detective Bergman's sworn affidavit. Gov. Ex. 1. The warrant identified the premises to be searched as 4144 Indian Runn, Apartment E, Harrison Township, Montgomery County, Ohio 45415. *Id.* The affidavit detailed the initial surveillance of the Impala; the officers' attempt to stop the vehicle before it collided with the police cruiser while being driven by the man in a lime green hat; the pursuit of the Impala; the vehicle's discovery in the vicinity of 4144 Indian Runn Drive; the observation of Palmer on the balcony in the green hat while hearing him state that he had just run from police; the fact that Palmer was known to area law enforcement as a heroin dealer with firearm convictions; Brooks' false statement that only two persons were in Apartment E; the presence of Defendant Wynn in the apartment, who was known to law enforcement as a heroin dealer, had a conviction for possession of heroin, and faced a pending possession charge; the protective sweep of the apartment and the observation, in plain view, of the empty gel capsules, the suspected heroin, the suspected marijuana, and the Glock pistol box.[4] *Id.* Joi Wright was identified as a resident of the apartment. *Id.* The affidavit stated that,

---

[4] The affidavit did not mention the assault rifle, although Special Agent Ferguson testified that it was among the items observed in plain view during the protective sweep. Doc. #41 at 29-31. Nor did the affidavit mention Ms. Norvelle's false assertion that there were no other occupants in the apartment.

8

based on the foregoing, probable cause existed to believe that several Ohio offenses had been committed, including possession of drugs under Ohio Revised Code § 2925.11; trafficking in drugs under Ohio Revised Code § 2925.03; felonious assault under Ohio Revised Code § 2903.11; and having weapons while under disability under Ohio Revised Code § 2923.13. *Id.*

A search was conducted the same day. Gov. Ex. 3. Law enforcement seized approximately 26 items, including suspected narcotics, drug paraphernalia, firearms, and ammunition. *Id.* The next day, March 8, 2013, an addendum to the warrant was filed, signed by Detective Bergman and Judge Heck. *Id.* The addendum stated that original warrant had misidentified Joi Wright as the resident of Apartment E, and that Darrionne Norvell actually resided there. *Id.* Both Defendant Wynn and Ms. Norvell lived in the apartment on the date of the search. Doc. #41 at 84.

Based upon the evidence seized, Defendant Wynn and Defendant Palmer were indicted on March 28, 2013. Doc. #18. Both Wynn and Palmer face charges of possession with intent to distribute heroin under 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 841(b)(1)(C) (Count One and Count Two), and aiding and abetting each other, in corruptly attempting to alter, destroy, mutilate and conceal a mixture or substance containing heroin with intent to impair its integrity and availability for use in an official proceeding under 18 U.S.C. § 1512(c) and 18 U.S.C. § 2 (Count Seven). Defendant Wynn is charged with being a felon in possession of a firearm under 18 U.S.C. § 922(g)(1) (Count Three) and being a felon in possession of

9

ammunition under 18 U.S.C. § 922(g)(1) (Count Four).  Defendant Palmer is also charged with using and carrying a firearm during and in relation to a drug trafficking crime under 18 U.S.C. § 924(c) (Count Five), as well as receipt of a firearm under 18 U.S.C. § 922(n) (Count Six).

On May 24, 2013, Defendant Wynn filed a Motion to Suppress, arguing that his Fourth, Fifth, Sixth, and Fourteenth Amendment rights were violated.  Doc. #35.  He seeks suppression of any evidence seized from the apartment or statements made after the search.  The Court held an oral and evidentiary hearing on August 7, 2013.  Doc. #39.  On October 4, 2013, the Government filed a Response to Defendant's Motion to Suppress (Doc. #43) and Defendant filed a Memorandum in Support of the Motion to Suppress (Doc. #44).  Thereafter, the Government filed a Reply to Defendant's Memorandum on October 18, 2013 (Doc. #45), and Defendant filed a Reply Memorandum on October 19, 2013 (Doc. #46).

## II.  **ANALYSIS**

As an initial matter, the Court notes that the only real issue argued by Defendant Wynn is a Fourth Amendment challenge to the officers' warrantless entry into the residence he shared with Ms. Norvell.  Although Wynn's Motion to Suppress also invokes the Fifth and Sixth Amendments, the arguments in his memoranda and the evidence presented at the evidentiary hearing do not demonstrate or even suggest that any involuntary or incriminating statements were made while he was in custody or without the assistance of counsel.  Doc. #35 at

10

1, 5. Furthermore, Wynn's post-hearing Memorandum specifically states that he "moves the court for an Order suppressing the evidence obtained by the illegal entry, search and seizure of his apartment on March 7, 2013, and any subsequent fruits of that search, including statements, which evidence the Government seeks to use at Defendant's trial in violation of his Federal Constitutional rights." Doc. #44 at 9. Defendant Wynn appears, therefore, only to argue that a Fourth Amendment violation occurred, and for the suppression of evidence based on that violation.

Specifically, Wynn argues that there was insufficient justification for the protective sweep that revealed the plain-view contraband that provided probable cause to issue the search warrant, citing *United States v. Archibald*, 589 F.3d 289 (6th Cir. 2009). Doc. #44. He criticizes the initial description of the Impala as vague and points out that there was no criminal activity observed at the Cornell Woods complex. *Id.* at 6. Wynn argues that the attempted stop of the Impala for a tinted windows violation was an "apparent subterfuge," because Special Agent Ferguson testified that the man with the green hat was visible inside the car. *Id.* at 7. He describes the Impala's collision with the police car as "either a dent, a scratch, or both," after which the Impala merely "sped away," and argues that there were no injuries sustained by the officers or danger to them personally. *Id.* Wynn asserts that there was no danger to law enforcement at the Indian Runn apartment before the sweep, as Palmer was simply talking on a cell phone while on the balcony and none of them "resisted [or] posed any danger to police" when they

11

were arrested.  In short, Wynn argues that Palmer "had really done nothing more than hit a police car and left the scene," and that any danger "was created by the officers, because none existed without their blunt force attack on the Indian Runn Apartment."  *Id*. at 8-9.

The Government, in turn, presents three arguments to support its burden of demonstrating that a Fourth Amendment violation did not occur and that the evidence against Wynn should not be suppressed.  Doc. #43.  First, the Government argues that the warrant was valid because the face of the affidavit demonstrated the existence of probable cause that drug and firearms offenses had been committed.  *Id.* at 5-6.  Second, the Government points to a number of facts that made it reasonable for the officers to believe that the Indian Runn apartment harbored a danger to them, justifying the protective sweep.  *Id.* at 6-9.  Third, the Government urges the Court not to suppress any evidence if it determines that the search warrant lacked probable cause or relied on an illegal predicate search, arguing that the "good faith" exception to the exclusionary rule should apply.  *Id.* at 10-13.

Defendant Wynn's Reply reiterates "his interpretation of the real facts," and accuses the Government of creating exigent circumstances to justify the officers' warrantless entry.  Doc. #46 at 4-6.  He argues that there was no danger created by Palmer's speedy getaway, a "terrified" and pregnant Darionne Norvell answering the door in her bathrobe, Palmer "timidly" emerging from the apartment, or Defendant Wynn himself.  *Id.* at 5-6.  Rather, Wynn asserts that "[i]f there was

12

any danger, it was created by police who stormed the apartment with guns drawn and police dogs at the ready." *Id.* at 5.

The Government's Reply clarifies that although Wynn "raises the exigent circumstances standard while discussing protective sweeps" in his brief, the Government only asserts that the officers were engaging in a protective sweep and "[t]he exigent circumstances standard does not apply here."  Doc. #45 at 2. The Government also argues that *United States v. Archibald*, 589 F.3d 289 (6th Cir. 2009), cited by Defendant, is distinguishable, and that the factual circumstances of the sweep are more analogous to *United States v. Rodriguez*, 601 F.3d 402 (5th Cir. 2010), in which law enforcement officers "were given false and conflicting information about the occupants" of a dwelling before entering. *Id.* at 4.

A.      Defendant's Fourth Amendment Challenge to the Officers'
        Warrantless Entry

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" by requiring that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV. "Unreasonable searches or seizures conducted without any warrant at all are condemned by the plain language of the first clause of the Amendment."  *Payton v. New York*, 445 U.S. 573, 585 (1980).  Although the Fourth Amendment

protects a range of privacy interests, "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Id.* (quoting *United States v. United States District Court*, 407 U.S. 297, 313 (1972)); *see also Kyllo v. United States*, 533 U.S. 27, 31 (2001) (observing that "[w]ith few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no"). Without a valid warrant authorizing officers to enter into a defendant's home, the Government must overcome the presumption that the entry was unreasonable. *United States v. Rohrig*, 98 F.3d 1506, 1515 (6th Cir. 1996). When the defendant challenges the warrantless entry, the government bears the burden of proving that some exception to the warrant requirement applies. *United States v. Jeffers*, 342 U.S. 48, 51 (1951); *United States v. Akrawi*, 920 F.2d 418, 421 (6th Cir. 1990). "A heavy burden must be borne by the Government in demonstrating the need for an exception to the warrant requirement." *United States v. Langley*, 466 F.2d 27, 34 (6th Cir. 1972) (citing *Jeffers*, 342 U.S. at 51). "Before agents of the government may invade the sanctity of the home, the burden is on the government to demonstrate exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries." *Welsh v. Wisconsin*, 466 U.S. 740, 750 (1984). Defendant Wynn lived at the apartment in question with his girlfriend, Darionne Norvelle. Doc. #41 at 84. He had a reasonable expectation of privacy in his residence, a place that law enforcement officers entered without a warrant.

14

There are only "a few specifically established and well-delineated exceptions" to the warrant requirement of the Fourth Amendment. *Katz v. United States*, 389 U.S. 347, 357 (1967). For example, exigent circumstances may "make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) (quoting *Mincey v. Arizona*, 437 U.S. 385, 393-94 (1978)). Examples of such exigent circumstances include the hot pursuit of a fleeing suspect, the need to render emergency assistance, or the immediate need to prevent the destruction of evidence. *Id.* (citations omitted).

Another exception is the warrantless, protective sweep of a residence that law enforcement officers may perform after an arrest to secure and ensure their safety. *Maryland v. Buie*, 494 U.S. 325, 334 (1990). In *Buie*, the Supreme Court identified two types of protective sweep. *Id.* The first allows that, "as an incident to the arrest the officers [can], as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Id.*

The second type of protective sweep is qualitatively different, as it may extend into other areas. *Id.* However, because it is more intrusive, this type of sweep requires "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest

15

scene." *Id.* Such a sweep is "not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found." *Id.* at 335. Because it is not a full search, the sweep must "last[] no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." *Id.* at 335-36. Because Defendants, Ms. Norvell, and Ms. Wright were handcuffed outside Defendant Wynn's apartment, the second type of protective sweep is implicated. *United States v. Colbert*, 76 F.3d 773, 777 (6th Cir. 1996) (applying *Buie*'s second type of protective sweep and stating that "the fact that the arrest takes place outside rather than inside the home affects only the inquiry into whether the officers have a reasonable articulable suspicion that a protective sweep is necessary by reason of a safety threat"); *United States v. Archibald*, 589 F.3d 289, 297 (6th Cir. 2009) (collecting cases and requiring arrest outside a residence to be analyzed under the second *Buie* test).

Defendant Wynn had no reasonable expectation of privacy in the hallway outside his apartment. *See United States v. Dillard*, 438 F.3d 675, 682-83 (6th Cir. 2006) (observing that defendant "did not have a reasonable expectation of privacy in the common hallway and stairway of his duplex ). Thus, although the arrests occurred inside the apartment building, they occurred in a space where Defendant Wynn's Fourth Amendment rights did not extend. The fact that the police officers were in the hallway outside the apartment is analogous to both *Colbert* and *Archibald*, where the arrests and the decision to enter a protected area

16

were made in an outside area that was unprotected by the Fourth Amendment. Under such circumstances, the Government must demonstrate the existence of articulable facts to support the contention that law enforcement officers had a reasonable suspicion of danger coming from within the protected space they decided to enter. *Colbert*, 76 F.3d at 777; *Archibald*, 589 F.3d at 297. For purposes of a *Buie* sweep, therefore, it makes no difference whether the Defendant's arrest occurred outside a residence, outside the apartment building, or outside the apartment in a common hallway. Any such location is unprotected by the Fourth Amendment, and an exception to its protections must be demonstrated to justify subsequent entry into a protected area. Here, the Government offers a number of facts in support of its argument that the officers held a reasonable belief that, after the detention of Defendants, Ms. Norvell, and Ms. Wright, a dangerous individual remained inside the Indian Runn apartment.

First, the Government asserts that the tip that someone was selling drugs from a blue Impala in a known drug trafficking area, Palmer's flight, collision, and high speed chase "at a great risk to others," and the fact that "drug trafficking is an inherently dangerous activity" should all factor into the calculus of what the officers reasonably feared lurked within the Indian Runn apartment. Doc. #43 at 8. However, the Sixth Circuit has cautioned that facts associated with an arrested defendant "are not appropriate facts to consider when determining whether the arresting officers reasonably believed that *someone else inside the house* might

17

pose a danger to them." *Colbert*, 76 F.3d at 777 (6th Cir. 1996) (emphasis in original).

In *Colbert*, police arrived at the apartment that the defendant shared with his girlfriend with an arrest warrant for the defendant, a murder suspect being charged "with escape in relation to previous convictions for weapons violations and assault." *Id.* at 775. The police arrested the defendant after he emerged from the apartment and walked to his car, parked forty to fifty feet away. *Id.* After the arrest, the defendant's girlfriend "came running out of the apartment, 'very irate, screaming and yelling,' and in a 'hostile rage.'" *Id.* Immediately afterward, an officer went to the front door because he was "concerned" that someone else might be inside. *Id.* After opening the screen door and identifying himself as the police, he saw a shotgun in plain view, leaning against a wall. *Id.* The officer then entered, conducted a protective sweep, and observed a revolver and drug paraphernalia in plain view that formed the basis for a search warrant. *Id.* The district court overruled the defendant's motion to suppress evidence obtained during the subsequent search pursuant to the search warrant, citing the dangerousness of the defendant and the girlfriend's behavior. *Id*.

The Sixth Circuit reversed, finding "irrelevant" the dangerous factors associated with the defendant, as he was already in custody when the officers decided to perform the sweep. The alleged dangerousness of the arrested defendant "is not germane to the inquiry into whether the police may conduct a protective sweep in response to a reasonable suspicion of a threat from some *other*

18

*person* inside the home." *Id.* (citing *United States v. Henry*, 48 F.3d 1282, 1284 (D.C. Cir. 1995)) (emphasis in original). Rather, "[t]he facts upon which officers may justify a *Buie* protective sweep are those facts giving rise to a suspicion of danger from attack by a third party during the arrest, not the dangerousness of the arrested individual." *Id.* Otherwise, "nearly every arrest taking place in or near a home [would] include a protective sweep." *Id.*

The Sixth Circuit applied *Colbert* in *United States v. Edgerson*, 243 Fed. App'x 974 (6th Cir. 2007). In *Edgerson*, police went to the apartment of the defendant's girlfriend based on a tip that the defendant was armed and had been dealing marijuana. *Id.* After knocking, the police waited twenty-five minutes before the defendant and two other men emerged. *Id.* None of them was armed or in possession of contraband. *Id.* at 974-75. After the men had exited, the police arrested the defendant pursuant to an arrest warrant, and then made "a brief warrantless entry into the home under the auspices of a 'protective sweep.'" *Id.* at 975. The girlfriend arrived some time later and consented to a search without knowing that the police had conducted the sweep. *Id.* While the Sixth Circuit upheld the lawfulness of the entry based on the girlfriend's consent, it held that the initial entry to perform the "protective sweep" was unlawful. *Id.* at 975-76. The court rejected the government's contention that "because one officer saw movement inside the house before [the defendant] surrendered and because the tip contained information that [he] was armed," the entry was justified. *Id.* at 975.

19

Such facts did not amount to "articulable facts that would lead to the rational inference of a threat *after* [the defendant] had surrendered, unarmed." *Id.*

In both *Colbert* and *Edgerson*, the Sixth Circuit rejected the Government's contention that articulable facts justified the warrantless entry into a home to perform a protective sweep after the arrest of the "dangerous" defendant occurred outside the home and without resistance. Under *Buie*, such a sweep is qualitatively different than one conducted incident to arrest inside a home, which authorizes a cursory inspection of immediate areas of the arrest without reasonable suspicion. 494 U.S. at 334. Here, as in *Colbert* and *Edgerson*, the officers made the decision to conduct the sweep after the officers arrested Defendant Palmer, outside the apartment and without incident. Under *Colbert*, Palmer's arrest resolved any danger associated with Palmer's presence in the Impala during suspected drug activity, Palmer driving the Impala into a police cruiser, and Palmer driving away at high speed. After his arrest outside the apartment, it was not reasonable to associate the dangerousness of those activities with anyone else inside. The only possible exception might be Ms. Wright, who had been seen in the Impala with Palmer. However, the Government does not suggest that the officers attributed any danger to Ms. Wright. Even if they did, she, too, had been detained before the officers decided to perform the sweep. As in *Colbert* and in *Edgerson*, both Palmer and Ms. Wright were detained outside the apartment before the officers decided to enter, and it was not reasonable to fear any further danger based on their activities.

20

Next, the Government points to Palmer's statement, overheard from the balcony, that he had fled from police, "from which officers could conclude there may [have been] other people in the apartment beyond Defendant, Wright, Palmer, and Norvell." Doc. #43 at 8. Palmer's statement surely gave the officers reason to infer that others beside *Palmer* were inside the apartment as they made their way inside the building. That inference was confirmed when Ms. Wright opened the door, revealing herself, Ms. Norvell, and Palmer. Once the inference was confirmed, Palmer's statement could continue to provide some basis to infer that still others were inside the apartment. However, while Palmer's statement provided an initial basis to believe that others were inside the apartment, it provided no reason to infer a threat or attack from anyone he may have been speaking to, particularly once both Defendants, in addition to the females, had been detained outside the apartment in the common hallway. Moreover, Special Agent Ferguson acknowledged that, after arriving at the apartment, he knew of no activity that had taken place that posed a danger to the officers outside, nor was any reported to him.[5] Doc. #41 at 65-66. Preventing "danger to those on the arrest scene" is the crucial rationale for a protective sweep. *Buie*, 494 U.S. at 334.

---

[5] Special Agent Ferguson's statement does not mean that he did not subjectively fear danger from inside the apartment. However, even if he did, *Buie* requires an objectively *reasonable* belief that "the area to be swept harbors an individual posing a danger to those on the arrest scene." 494 U.S. at 334. Here, the arrest scene was the hallway *outside* the apartment. Doc. #41 at 25-26.

The Government also points to the ten to fifteen second delay before Ms. Norvell answered the apartment door. The Government characterizes Ms. Norvell's response as "slow," and asserts that "it would be reasonable to infer that one cause for the delay was activity posing a danger to the officers." Doc. #43 at 8. Special Agent Ferguson testified that he considered ten to fifteen seconds "an excessive amount of time," due to the size of the apartment and his belief that at least two or three persons were inside. Doc. #41 at 24. The Court finds ten to fifteen seconds an entirely acceptable amount of time for a person to answer their apartment door, and not a reasonable basis for inferring that dangerous activity exists within the apartment, or that officers later should fear danger from inside the apartment after the arrests outside occurred.[6] *Cf.*, *United States v. Hendrix*, No. 3:05-00215, 2006 WL 1207636 (M.D.Tenn. May 2, 2006) (finding reasonable the assertion that delay of one to two minutes caused officer concern after officer knew that woman inside had seen him through kitchen window). Furthermore, the officers did not face a situation where the delayed response created a reason to fear the destruction of evidence, based on an announced intention to execute a search warrant. *See, e.g.*, *United States v. Banks*, 540 U.S. 31 (2003) (holding

---

[6] In *Edgerson*, the Sixth Circuit did not address the twenty-five minute delay before the occupants exited the home that the district court had determined to be a reasonable basis to fear danger. *Compare Edgerson*, 243 Fed. App'x 974 (6th Cir. 2007) *with United States v. Edgerson*, No. 05-80763, 2006 WL 83478 (E.D. Mich. Jan. 12, 2006) (finding that the defendant's twenty-five minute delay before emerging from the house gave "anyone inside ample time to prepare an ambush on the officers"). Such a delay might well provide a reasonable basis to infer danger. Here, however, Ms. Norvell's ten to fifteen second delay is not remotely comparable.

that a fifteen to twenty second delay was a reasonable amount of time to wait under the Fourth Amendment and 18 U.S.C. § 1309 before forcible entry to search for cocaine, while acknowledging "this call is a close one"). Moreover, Ms. Norvell's appearance in a bathrobe, only partially dressed, should have allayed any concern caused by the delay. She was obviously busy when the knocking began.

The Government also points to the false statements made by Brooks and Ms. Norvell regarding the number of persons inside the apartment as justification for fearing dangerous activity from within. Doc. #42 at 8-9. Because an officer had just observed Palmer on the balcony, it was evident that Brooks falsely stated that two females were inside the apartment. Thus, as the officers moved towards the door, they had a reasonable basis for believing that the actual number or gender of its occupants was unknown to them. It is difficult to attribute any lasting value to that insight, however, once the door opened and the presence of Ms. Norvell, Ms. Wright, and Palmer became known to the officers. The observation of those three occupants confirmed the officers' suspicion that 1) Palmer was, in fact, within the apartment, and 2) that two females were also inside, as Brooks had asserted.

Once Defendant Palmer, Ms. Norvell, and Ms. Wright were detained outside the apartment, Special Agent Ferguson asked Ms. Norvell whether anyone else was still inside the apartment. She replied that there was not.[7] When Wynn's

---

[7] The Court recognizes the conflict between Special Agent Ferguson and Ms. Norvell's testimony regarding whether she actually stated that there was no one

23

hands subsequently appeared, officers realized that her reply was untrue. The Government asserts that her statement "supports an inference that Norvell was trying to hide the presence of others from the officers." Doc. #43 at 9. The major inference, however, is that she was trying to hide Defendant Wynn's presence from the officers. Once he appeared, the officers had every reason to believe that she had lied about his presence. But apart from confirming the falsity of her statement, it is difficult to find that her reply provided a continuing basis to infer the presence of an unknown number of persons inside the premises.

Finally, the Government points to the fact that Defendant Wynn waited until the other occupants had been detained before emerging from the apartment. The Government argues that "there [was] no apparent explanation for such a delay, also creating an inference of an unseen danger." Doc. #43 at 9. There are two problems with this argument. First, it relies too heavily on a danger attributable

---

else inside the apartment, prior to the appearance of Defendant Wynn. Doc. #41 at 26, 92; Doc. #43 at 9 n. 1; Doc. #46 at 5. The Court credits Special Agent Ferguson's testimony over Ms. Norvell's for several reasons. First, Ms. Norvell testified that she did not say that no one else was in the apartment, but then qualified her statement by saying that she didn't "recall them asking." Doc. #41 at 92. Thus, it is unclear from her testimony whether her denial is based on anything more than not remembering being asked. Second, Ms. Norvell testified that she had returned to the apartment with Defendant Wynn that morning, so she must have known that he was, in fact, in the apartment. *Id.* at 86. Any statement made to Special Agent Ferguson to the contrary was, therefore, false. Finally, her credibility as a witness was undermined by several of her responses to questions regarding evidence discovered in her apartment during the Government's cross examination, such as the assertion that she had "never seen" the AR-57 assault rifle that was discovered in plain view leaning against the wall of the walk in closet that she shared with Defendant Wynn "day in and day out." *Id.* at 102. The assertion is particularly difficult to credit given the fact that she was getting dressed when the police arrived.

solely to Wynn, who was detained *outside* the apartment *before* deciding to perform the sweep.  Under *Colbert*, danger associated with Wynn's delay should not be attributed to unknown third persons after his arrest.  76 F.3d at 777 ("If district courts are allowed to justify protective sweeps based on the dangerousness of the arrestee, nearly every arrest taking place in or near a home will include a protective sweep").

Second, even if Wynn's delay created an inference that an unknown danger still lurked within the apartment, the lack of an "apparent explanation" for the delay is an insufficient basis from which to infer an attack.  In *United States v. Archibald*, 589 F.3d 289 (6th Cir. 2009), the Sixth Circuit emphasized that speculation or the mere unknown is insufficient reason to infer danger and proceed with a *Buie* protective sweep.  In *Archibald*, officers arrived at a defendant's house to serve him with several arrest warrants based on the defendant's parole violations.  *Id.* at 291.  After knocking and a delay of three to five minutes, during which time an officer heard "shuffling sounds" and "someone moving around inside," the defendant opened the door, was pulled outside, and arrested.  *Id.* at 292.  The Sixth Circuit rejected the "articulable facts" presented to justify the subsequent entry and sweep of the residence, which included the defendant's prior arrests for violent crimes, the officer's "perceived vulnerability" at the doorway to the residence, and the delayed response to the knocking and the shuffling sounds inside.  *Id.* at 299-301.  Citing *Colbert*, the Sixth Circuit reiterated the irrelevancy of an arrested defendant's "dangerousness" to justify a protective sweep after the

25

arrest "where the record contains no evidence, circumstantial or otherwise, of the presence of a dangerous third party in [the defendant's] residence." *Id.* at 299. Furthermore, the officers could not point to their position in the doorway as justification because "the prudent course of action would have been to back away from the door, not proceed through it." *Id.* The sounds heard by the officer while waiting for a response suggested that there was only one person inside, and the Sixth Circuit rejected the officer's mere "assumption" that more persons might have been inside: "Clearly, *Buie* requires more than ignorance or a constant assumption that more than one person is present in a residence." *Id.* at 300.

Thus, *Archibald* rejects the unknown as a basis from which to infer the existence of some danger that justifies a protective sweep. *Id.* Such justification would be "directly contrary to the Supreme Court's explicit command in *Buie* that the police have an articulable basis on which to support their reasonable suspicion of danger from inside the home. 'No information' cannot be an articulable basis for a sweep that requires information to justify it in the first place." *Id.* (citing *Colbert*, 76 F. 3d at 778).

The Government believes *Archibald* to be "factually different" from the case before the Court.[8]  Doc. #45 at 3.  The facts are almost always different,

---

[8] The Government analogizes the present situation to *United States v. Rodriguez*, 601 F.3d 402 (5th Cir. 2010), because of the "great weight" that the Fifth Circuit placed on the fact that there were children in a trailer home that the mother had not mentioned during a 911 call reporting physical abuse by her husband. However, there had also been a "previous domestic disturbance" reported "involving [the defendant] and a young man" at the trailer, the police knew that

particularly in Fourth Amendment cases, but *Archibald's* are similar enough to guide the Court's analysis. In *Archibald*, once the defendant's presence provided an explanation for the sounds heard inside the house, the officers could not continue to speculate that there might be others within. Similarly, once Wynn's delay brought him out of the apartment, it should not have provided fodder for further inferences about others within. Too many of the Government's "articulable facts" exhausted their inventory of inferences before the moments that Government claims they provided a basis for believing that the apartment held more occupants. More importantly, none of them provides a basis for any reasonable belief of danger or attack, the entire rationale for a *Buie* sweep.

The insufficiency of the Government's explanation for the decision to perform the sweep is also evident in Special Agent Ferguson's response to the following questions, which followed his testimony describing Wynn's emergence from the apartment:

> Q.    At this point in time, did you and the other officers make a determination of whether a protective sweep of that apartment needed to be done?
>
> A.    Absolutely.
>
> Q.    And what was the determination that was made?

---

the defendant kept a gun inside the trailer before arriving, and they were given consent to enter the trailer. *Id.* at 406. The factual parallels are not compelling, particularly in light of the consent to enter and the scene of domestic violence that the police were attempting to secure.

> A. Based on the fact that I had just pulled Mr. Wynn out of the apartment complex and handcuffed him, I determined that it was prudent for us to conduct a safety sweep.

Doc. #41 at 27.

According to Special Agent Ferguson, his arrest of Wynn justified the entry and protective sweep. This purported justification states no facts from which danger to the officers from *anyone other* than Defendant Wynn might be inferred. Again, there is a dearth of articulable facts about danger that officers feared from a third party *other than* the "defendant under their control" outside the apartment. *United States v. Biggs*, 70 F.3d 913, 916 (6th Cir. 1995). *Biggs*, which the Government cites, further illustrates this requirement. In *Biggs*, the Sixth Circuit upheld a protective sweep of a motel room 20-75 feet from the arrest site based on articulable facts about another individual, namely: a tip that "another person would be meeting defendant at the motel room," the fact that the defendant "had been arrested on two previous occasions in the presence of someone in possession of a firearm," and the fact that the defendant left the door open in a way to provided "a clear view of the officers" from inside the room. *Id. See also United States v. Stover*, 474 F.3d 904, 912 (upholding protective sweep based upon the presence of a car parked in the defendant's driveway that was registered to a local criminal, justifying belief that another adult was in the house). In both *Biggs* and *Stover*, articulable facts about a potentially dangerous third party justified the sweep. Here, in contrast, there are no facts, after Wynn's arrest outside the

28

apartment, from which to infer the existence of a third party that amounts to more than mere speculation.

   In short, the Government has failed to meet the "heavy burden" that it bears in order to overcome the presumptive unreasonableness of a warrantless entry into a home. *United States v. Langley*, 466 F.2d 27, 34 (6th Cir. 1972) (citing *United States v. Jeffers*, 342 U.S. 48, 51(1951)).  None of the occupants of the Indian Runn apartment resisted arrest as the officers pulled them out, one by one, into the hallway outside.  Crucially, Special Agent Ferguson testified that he observed *no* activity that posed a danger to the officers after arriving at the apartment, nor was any reported to him.  Doc. #41 at 65-66.  *Buie* requires more. Here, as in *Archibald*, "the prudent course of action would have been to back away from the door, not proceed through it."  589 F.3d at 299.

   Accordingly, the Court concludes that the warrantless entry and protective sweep of Defendant Wynn's apartment was not justified under *Maryland v. Buie*, 494 U.S. 325 (1990).

### B.    The Validity of the Search Warrant

   An affidavit sworn to support a valid search warrant must contain "a substantial basis" for the reviewing magistrate to conclude that probable cause justifies the search. *Illinois v. Gates*, 462 U.S. 213, 238-39 (1983).  Probable cause is a "practical, nontechnical conception" of probabilities in an everyday, nonmathematical sense. *Id.* at 231 (quoting *Brinegar v. United States*, 338 U.S.

160, 176 (1949)).  Thus, the notion of "probable cause is a fluid concept– turning on the assessment of probabilities in particular factual contexts– not readily, or even usefully, reduced to a neat set of legal rules."  *Id.* at 232.  Although probable cause resists precise definition, it may be described as "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion."  *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990) (citing *United States v. One 1984 Cadillac*, 888 F.2d 1133, 1135 (6th Cir. 1989)).

The reviewing court must employ a totality of the circumstances analysis to determine whether probable cause existed to issue the warrant.  *Gates*, 462 U.S. at 238.  "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place."  *Id.*  Furthermore, the reviewing court need only assure itself that a substantial basis supported the initial probable cause determination.  *Id.* at 238-39.  The issuing magistrate's conclusion must be "afforded great deference and should only be reversed if arbitrarily made."  *United States v. Jackson*, 470 F.3d 299, 306 (6th Cir. 2006) (citing *United States v. Allen*, 211 F.3d 970, 973 (6th Cir. 2000)).

When reviewing the magistrate's probable cause determination, a court must limit its focus to the information presented within the four corners of the warrant's affidavit.  *Id.* (citing *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005)).  The nature of the totality of the circumstances analysis precludes "engaging in line-

by-line scrutiny" or a "hypertechnical" reading of the supporting affidavit. *United States v. Woosley*, 361 F.3d 924, 926 (6th Cir. 2004). Instead, a "flexible, common-sense standard" is required. *Gates*, 462 U.S. 213, 239 (1983). Nevertheless, because the magistrate's decision should be neutral and detached, and not merely a rubber stamp for law enforcement, deference to the magistrate's conclusion is not unlimited. *United States v. King*, 227 F.3d 732, 739 (6th Cir. 2000) (internal citations omitted).

The Court preliminarily notes that the search warrant was issued based on a probable cause determination that several state law offenses had been violated, namely possession of drugs under Ohio Revised Code § 2925.11; trafficking in drugs under Ohio Revised Code § 2925.03; felonious assault under Ohio Revised Code § 2903.11; and having weapons while under disability under Ohio Revised Code § 2923.13. Thus, it is probable cause for the foregoing state law offenses that Detective Bergman's affidavit must have provided, not for the federal charges with which Defendant Wynn was ultimately indicted. *See*, *e.g.*, *United States v. Jones*, 572 F.Supp.2d 601, 613 (W.D. Pa. 2008) (finding that a federal district court "evaluates the presence of probable cause under the Fourth Amendment in an application for a search warrant and its accompanying affidavit of probable cause [authorized by] a state judge by referring to the elements of the state crime at issue in the search warrant").

The Government argues that sufficient probable cause existed to justify the search, based upon Detective Bergman's affidavit describing Defendant Wynn's

31

presence in the apartment, his history of drug and firearms charges, the suspected

heroin and marijuana in plain view, the presence of Defendant Palmer after fleeing

from police from a "high frequency drug trafficking area," and the existence of a

box for firearms in plain view. Doc. #43 at 5-6. Defendant Wynn does not

address or respond to the Government's argument, apparently conceding that the

affidavit, on its face, demonstrated sufficient probable cause to justify Judge

Heck's approval of the search warrant.

However, the Court must excise from the face of the affidavit any

references to the protective sweep and the evidence observed in plain view after

the officers' illegal entry. *United States v. Shamaeizadeh*, 80 F.3d 1131, 1136

(6th Cir. 1996). This requires excising the last descriptive paragraph of Detective

Bergman's affidavit in its entirety:

> Officers and agents conducted a protective sweep of apartment E,
> and observed items of evidence in plain view. Some of the items
> observed included the following: a cup full of empty gel capsules,
> located on the dining room table; a baggie of suspected marijuana,
> located on the bathroom sink; a baggie of suspected heroin, located
> on the top of the bedroom dresser; and a Glock pistol box, located on
> the floor next to a night stand in the bedroom.

Gov. Ex. 1.

The question then becomes "whether the untainted portion of the affidavit

... sufficiently supported a finding of probable cause." *Shamaeizadeh*, 80 F.3d at

1136 (quoting *United States v. Campbell*, 878 F.2d 170, 173 (6th Cir. 1989)).

The remainder of the affidavit describes the initial surveillance of Palmer, the stop

at the Cornell Woods West apartments ("an area where there is frequent drug

32

trafficking"), the attempt to stop the Impala, its collision with the police vehicle, the high speed chase, the discovery of the Impala at the Indian Runn Apartment complex, Palmer's appearance on the balcony stating that he had just run from police, Palmer's convictions for selling firearms and known history as a heroin dealer, the presence of Defendants, Ms. Wright, and Ms. Norvell in the apartment, and Wynn's convictions for possession of heroin and law enforcement's knowledge that he is a heroin dealer who caries firearms.

Based on the foregoing, there is very little to link the apartment to the drug possession and trafficking offenses listed on the warrant, other than 1) the Impala and Palmer were in an area known for such activities before being discovered at the apartment, and 2) the Defendants' criminal histories.[9]  That is an insufficient basis for probable cause for a warrant to search the apartment for evidence of drug trafficking.  The fact that Defendant Wynn was in his own apartment adds nothing to the analysis.  With regards to the weapons offense, there is no evidence to support a probable cause finding after the excision of the plain view evidence, as the affidavit contains no other evidence of weapons or firearms.

Finally, although none of the excised plain view evidence relates to it, the Court questions whether the affidavit ever supported a probable cause finding regarding the felonious assault offense.  The offense allegedly occurred miles from the Indian Runn apartment and the Impala was parked in its parking lot outside.

---

[9] Notably absent from the affidavit is any mention of the "capping up" that Special Agent Ferguson testified that he and Detective Bergman observed Palmer engage in as they passed the Impala.  Doc. #41 at 43, 45.

Although Palmer was discovered within the apartment, it was not his residence. Furthermore, none of the items of property that are "connected" with the offenses listed on the warrant relate to felonious assault, only to the drugs and weapons offenses.

Based on the foregoing, the Court concludes Detective Bergman's affidavit, without the plain view evidence observed after the illegal entry, did not provide probable cause for the search warrant that was issued.

### C. The *United States v. Leon* "Good Faith" Exception to the Exclusionary Rule

In *United States v. Leon*, 468 U.S. 897 (1984), the Supreme Court described a "balancing approach" that allows the introduction of evidence obtained when law enforcement acts with a reasonable, good faith belief that the search producing it complied with the requirements of the Fourth Amendment. 468 U.S. 897 at 909. Even if a warrant is ultimately determined to be invalid based on a lack of probable cause, *Leon* warns that "the marginal or nonexistent benefits produced by suppressing evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant cannot justify the substantial costs of exclusion." *Id.* at 922. The good faith exception recognized in *Leon* does not apply in the following four situations:

> (1) where the issuing magistrate was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth; (2) where the issuing magistrate wholly abandoned his judicial role and failed to act in a neutral and detached fashion, serving merely as a rubber stamp

34

for the police; (3) where the affidavit was nothing more than a "bare bones" affidavit that did not provide the magistrate with a substantial basis for determining the existence of probable cause, or where the affidavit was so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where the officer's reliance on the warrant was not in good faith or objectively reasonable, such as where the warrant is facially deficient.

*United States v. Hython*, 443 F.3d 480 (6th Cir. 2006) (citing *Leon*, 468 U.S. at 923).

Since deciding *Leon*, the Supreme Court has reaffirmed that the application of the exclusionary rule is not "a necessary consequence of a Fourth Amendment violation." *Herring v. United States*, 555 U.S. 135, 141 (2009) (quoting *Leon*, 468 U.S. at 905-06). Rather, "appreciable deterrence" must result from the exclusion of evidence, and "the benefits of deterrence must outweigh the costs." *Id.* (citing *Leon*, 468 U.S. at 909, 910). Furthermore, "[t]he extent to which the exclusionary rule is justified by these deterrence principles varies with the culpability of the law enforcement conduct." *Id.* at 143. Only when an "officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment" should evidence be excluded. *Id.* at 143 (quoting *United States v. Peltier*, 422 U.S. 531, 542 (1975)).

The Government argues that the Court should apply *Leon*'s "good faith" exception to the exclusionary rule and not suppress any evidence obtained from the search of Wynn's apartment. The Government cites *United States v. McClain*, 444 F.3d 556, 566 (6th Cir. 2005), in which evidence obtained pursuant to a search warrant based on an illegal predicate search did not warrant exclusion

because "because the facts surrounding the initial warrantless search were close enough to the line of validity to make the executing officers' belief in the validity of the search warrants objectively reasonable" under *Leon*.  In *McClain*, the facts suggested that the possible exigent circumstances justified the warrantless entry by police, who had been called to investigate the suspicion of a burglary in progress at a vacant house and entered after discovering the front door ajar.  The facts in *McClain* were "close enough to the line of validity" for one judge to concur in the judgment but write separately that the exigent circumstances exception should have applied.  444 F.3d at 566 (Boggs, J., concurring in the judgment).

There are several reasons why *McClain* does not apply.  First, the present case does not involve a "close call" on an exigent circumstances argument.  The Government has specifically stated that exigent circumstances were not the reason that law enforcement entered Defendant Wynn's apartment.  Doc. #45 at 2. Furthermore, the facts presented by the Government do not demonstrate that the facts supporting the officers' decision to conduct the protective sweep were close to the line of validity, where there was no articulable basis at the time of the decision for fearing an attack or danger from within the apartment.  Reasonable fear of such an attack is the entire justification for a protective sweep under *Buie*.

Another crucial factor in *McClain* was that "the officers who sought and executed the search warrants were not the same officers who performed the initial warrantless search," and the warrants were obtained some six weeks after the initial search.  444 F.3d at 560, 566.  Here, in contrast, the officers who

36

conducted the warrantless entry obtained the warrant on the same day, then performed the search themselves.  Thus, in spite of Special Agent Ferguson's testimony that he and the other officers relied in "good faith" on the warrant, the Court cannot conclude that such reliance was objectively reasonable under *Leon*, given that the warrant was based on prior illegal acts.  Doc. #41 at 37-38.

Finally, and most importantly, a warrantless entry into a home that does not adhere to the constraints set forth under *Buie* is precisely the type of culpable law enforcement action susceptible to deterrence by the exclusionary rule.  *Herring*, 555 U.S. at 143.  After all, "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed."  *Payton v. New York*, 445 U.S. 573, 585 (1980) (quoting *United States v. United States District Court*, 407 U.S. 297, 313 (1972)).  Herein, the Court determines that the benefits of deterrence are not outweighed by the costs of exclusion.  Thus, the Court concludes that the circumstances surrounding the warrantless entry into Defendant's apartment undermined the validity of the search warrant, and *Leon*'s good-faith exception does not apply.

## III.  **CONCLUSION**

For the reasons set forth above, the Court concludes the following.  First, the initial warrantless entry and purported protective sweep of Defendant Wynn's apartment were not proper under *Maryland v. Buie*, 494 U.S. 325 (1990).  Second, after disregarding the contraband and firearms seen in plain view during

the illegal entry, probable cause did not support the warrant issued for the search of Defendant Wynn's apartment.  Third, the exception to the exclusionary rule under *United States v. Leon*, 468 U.S. 897 (1984), does not apply, as the benefits of deterring the illegal entry of a home outweigh the costs of exclusion, justifying the application of the exclusionary rule in this case.

The Court, therefore, SUSTAINS Defendant's Motion to Suppress Evidence (Doc. #10).  The Court orders the suppression of all fruits, including evidence and statements, derived from the search conducted pursuant to the warrant that authorized the search of Defendant' Wynn's apartment.


Date:  November 25, 2013            _____
                                    WALTER H. RICE
                                    UNITED STATES DISTRICT JUDGE


38